UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LAW OFFICE G.A. LAMBERT AND ASSOCIATES<br>(Law office in Washington, D.C.)<br><br>    Plaintiffs<br><br>-against-<br><br>TOFIK DAVIDOFF;<br>(German national)<br>KALIMANTANO GMBH;<br>FIRST ROYAL SERVICES GMBH<br>(German companies)<br><br>    Defendants | CIVIL No.<br><br>**COMPLAINT<br>FOR DAMAGES** |

This action is brought by a law office situated in the District of Columbia against its former clients, for collection of unpaid costs and legal fees.  It also seeks damages resulting from the former clients' fraud, such as sending false payment documents, with the purpose of obtaining their continued representation by said law office in the courts. The services by the law office were provided to, and/or were for the benefit of, Defendants in three separate actions in the U.S. District Courts, including two actions in the U.S. District Court for the Southern District of New York and one action in this U.S. District Court.

**PARTIES**

1.      Plaintiff Law Office G.A. Lambert and Associates (hereinafter "Law Office") is located at: 1025 Connecticut Ave., 1000, NW, Washington, D.C., 20036, tel.

(202) 640 1897, fax (800) 852 1950. Said Law Office is headed by attorney George A. Lambert ("Lambert"), admitted in the District of Columbia, bar #979327. Lambert shares the office arrangements with attorney Leonard Suchanek ("Suchanek"), who had served as the Administrative Judge in the Government procurement offices, whom Lambert considers as his senior advisor. Suchanek was uninvolved in the present matter. Lambert also relies on the assistance of two assistants, as the practice may require from time to time.

2.     Defendant Tofik Davidoff ("Davidoff") is a German national and business person. He is the principal of several entities in Germany, with offices located at LouisenStrasse 98, Bad Homburg, Germany (in proximity of Frankfurt-am-Main). Davidoff's business includes wholesale trade in meats and delicatessen. Davidoff's entities include Kalimantano GmbH, identified below. Davidoff is Defendant herein, because he failed to pay for the legal services for a substantial time prior to the Law Office's withdrawal from representing him. That includes Davidoff's sending to the Law Office false or untrue proofs of the wire transfers purportedly sent out per invoices, that in fact were never received and presumptively never sent out.

3.     Defendant Kalimantano GmbH (hereinafter also "Kalimantano") is a company incorporated in Germany, with office at: Louisen Strasse 98, 61348, Bad Homburg, Germany. Its manager and driving force is Davidoff, whose daughter is a nominal owner of that business. Kalimantano, located in one of the suburbs of Frankfurt-am-Main, is in the business of foodstuffs' wholesale, primarily in meats. Kalimantano offers supplies to stores and customers in Germany. The sales website of Kalimantano in Germany is at the link: www.kalimantano.de. That company has the registration information: HRB 11537, Amtsgericht Bad Homburg, tax ID 00323705022, Ust - Id Nr.

DE 813474195.  Kalimantano is Defendant herewith because it was represented by the Law Office in three actions, but it failed to make the overdue payments for the costs and legal fees.

4.      Defendant First Royal Services GmbH (hereinafter "First Royal") is a company incorporated in Germany, with office at the same address as Kalimantano: Louisen Strasse 98, 61348, Bad Homburg, Germany.  Davidoff and another person, whom the Law Office represented, are connected with First Royal, which engages in transportation services.  First Royal is Defendant herewith, because it was proposed to be a third-party payer and guarantor on the invoices to Davidoff and Kalimantano, upon which First Royal, likewise, failed to make those payments.

## UNDERLYING FACTS

5.      Davidoff contacted the Law Office in August of 2012.  When he first called and spoke to Lambert.  Davidoff was in a serious situation after a failed transaction in New York, after he attempted to acquire Swiss luxury watches.  Both sides in that failed business accused each other of fraud and misappropriation.  Davidoff's name was defamed by publications on the Internet dozens of highly offensive messages with his photograph (from his passport).  Those Internet publications accused Davidoff of being a thief and fraudster, as though he had misappropriated a high-end, luxury Swiss watch, Patek Philippe 5970-p ($175,000 value).

6.      Davidoff claimed damages caused by the sellers, Motion in Time, Inc. (hereinafter also "MIT"), a corporation registered in the State of New York, at the address: 56 West 47 Street, New York, NY, 10036, which also stands for its shop's location.   It was incorporated on January 24, 2004, #2998638, at the above address.  MIT

is owned by Eddie Shamayev and employs mostly members of his family (three sons) and his brother Michael Shamayev.  The Law Office had no conflict.

7.      The Law Office agreed to represent Davidoff and Kalimantano and to prepare litigation in the U.S., addressing both the damages from the losses and the defamatory publications on the Internet.  The Law Office sent to Davidoff a retainer contract, based on standard terms upon which it provides legal services.

8.      On September 3, 2012, Davidoff executed the retainer contract.  The Law Office, represented by Lambert, also executed it.  See Exhibit A.

9.      Under the terms of the retainer contract, the Law Offices represented Davidoff and, as needed, the entities, in which he was the principal, including Kalimantano.  The agreed initial retainer payment was $10,000.  The hourly rate for Lambert's fees as an attorney, was stated at $250 per hour.  Davidoff was responsible for costs and outlays.  The remainder of the terms of the contract of September 3, 2012, is incorporated by reference.  See Exhibit A.

10.     The Law Office investigated the facts and started to vigorously represent Davidoff, Kalimantano and its employee Konstantin Felde ("Felde"), as well as later First Royal's manager Johannes Schwegler ("Schwegler").

11.     On September 14, 2012, the Law Office filed in the U.S. District Court for the Southern District of New York the action Docket 12cv6969 (PAE), captioned *Kalimantano GmbH, Tofik Davidoff, Konstantin Felde v. Motion in Time Inc., Eddie Shamayev, Michael Shamayev, Boris Shamayev, David Shamayev*.  The Law Office also involved a local attorney in New York, Peter A. Joseph, to sponsor Lambert's appearance pro hac vice in that action.

12.     The claim in that action was stated for $885,000.  The action's docket sheet and all documents are in the public domain.  The allegations made there in great detail.  The course of the proceedings is not recited herewith.  The notation is made, however, that defendants in that action elected a very vigorous defense.

13.     On December 14, 2012, the Law Office filed in this U.S. District Court the second action of related nature, Docket 12cv2005 (CKK), captioned *Kalimantano GmbH, Tofik Davidoff, Konstantin Felde v. Godaddy LLC, Google Inc., Facebook, Inc., Microsoft Inc*.  The lawsuit sought to remove the defamatory postings on the Internet, concerning Davidoff and Kalimantano.

14.     That lawsuit was quite effective, without active litigation.  Within the following three months, nearly all defamatory postings were removed.  That was as a result of the Law Office's negotiations with representatives of the named defendants.  That included the removal of the defamatory website, www.tofikdavidoff.com.  Every week the number of the Internet postings concerning Davidoff was diminishing.  That matter in this Court was closed through negotiation, without seeking damages.

15.     The only remaining pocket of defamatory postings on the Internet concerning Davidoff remained a commercial website, trading in watches, called www.watchnetwork.com, operating out of New York.  The Law Office identified its operator, Daniel Hirsch ("Hirsch") and the corporate structures, that maintained that operation.  Despite the Law Office's request to remove the defamatory postings, Hirsch, not disclosing his name in the correspondence, declined.

16.     On January 25, 2013, the Law Office filed in the U.S. District Court for the Southern District of New York the third related action, Docket 13cv00560, captioned, *Kalimantano GmbH et al v. Daniel Hirsch*, *Watchnetwork.Com, MMI Distribution Inc.*,

*GMT Distribution, Twitter Inc.*  Like in the above scenario, that action was also effective and successful.  It resulted in the complete removal of the defamatory postings and settlement made on April 29, 2013.

17.     The remaining litigation, *Kalimantano et al. v. MIT et al.,* in the U.S. District Court for the Southern District of New York, went, on the contrary, through the most intense stage of proceedings on the repeated Motions to Dismiss.  On April 12, 2013, the U.S. District Court, in a 43-page ruling, granted in part and denied in part the Motion to Dismiss, concerning the Amended Complaint.  After that the litigation entered the most active stage of discovery.

18.     Until the invoice of May 6, 2013, the Law Office did not encounter problems with the payments by the clients.  That invoice covered the period from February 5 to May 5, 2013.  See Exhibit B.  The last payment actually made by Kalimantano was on March 13, 2013.

19.     After the Invoice of May 6, 2013, Davidoff made numerous excuses why the new payment was not forthcoming.  Usually, Davidoff was explaining that he was traveling outside of Germany, and he could not process the wire transfer at the time. Davidoff made promises on repeated occasions that the payment was to come.

20.     Finally, on June 21, 2013, Davidoff sent to the Law Office a copy of the bank instruction by Kalimantano to transfer 8,000 Euros.  On that date, that amount was subject to the exchange rage 1.311249, for the total $10,489.99.  See Exhibit C.

21.     However, that wire transfer was not coming to the Law Office's account (at the Bank of America, a major bank).  Davidoff expressed surprise that the money did not come, promised to look into and made different explanations.  Lambert was in contact with Davidoff either on the telephone or by e-mail, or both, his reminders about the

overdue invoice were met with the promises.  Davidoff assured Lambert that there was nothing to worry about, and all invoices would be paid.  However, Davidoff's repeated promises still did not materialize in the actual receipt of wire transfers from Germany on the Law Office's account.

22.     Lambert stressed before Davidoff that in light of his continued failure to pay, the forthcoming depositions were in jeopardy, because the deposition expenditures must be covered or secured in advance.  Davidoff, again, assured that the payments would be taken care of.  Lambert repeatedly suggested to Davidoff that, if he was unable to process the payments through the account of Kalimantano, then he and Felde ought to bring cash to New York, for which a written receipt, on behalf of the Law Office, could be given.

23.     Davidoff and Felde came to New York on August 25, 2013, to be at their depositions.  Lambert, who had organized their stay and reserved their accommodation at U.N. Millennium Hotel in New York (located next to the United Nations Plaza), met them at the hotel.

24.     On August 26, 2013, prior to the commencement of the depositions, Davidoff declared to Lambert that the ongoing payments were resolved.  According to Davidoff, his trading associate in Kazakhstan, Tochtar Tuleshov, had prepared a wire transfer of $20,000 to the Law Office.  Davidoff stated that the local currency was being converted into U.S. dollars, and this wire transfer was to come within a couple of days. Accordingly, there was no point in asking from Davidoff for cash payment.

25.     During his stay in New York, on or about August 29, 2013 Davidoff was apparently in contact with his distant relatives or acquaintances residing in New York, who supposedly offered mediation to settle the dispute with the MIT defendants.

Lambert advised Davidoff that, to avoid confusion, all settlement negotiations should be handled by the attorneys of record.

26.     Once Davidoff and Felde left back for Germany on August 29, 2013, the wire transfer for $20,000 still did not come.  In the telephone conversations with Lambert, Davidoff again expressed astonishment why that wire transfer was not yet on the account and, again, promised to look into it.

27.     On one occasion, on the eve of follow-up depositions that Lambert was to take, Davidoff wrote to Lambert to check the account, again, and to confirm whether the wire transfer had been received.  However, no wire transfer from Kalimantano was then received on the Law Office's account.

28.     On September 16, 2013, Davidoff asked Lambert to send over an invoice for $20,000 to First Royal, the company where co-plaintiff Schwegler was the manager, promising that that wire would be immediately processed through its account.  Davidoff alleged that Kalimantano's accounts were blocked.  Lambert complied and sent that instruction.  See Exhibit D.

29.     On September 19, 2013, Davidoff sent to the Law Office a copy of the banking instructions on behalf of First Royal, for 15,000 Euros.  See Exhibit E.

30.     However, the wire transfer was not coming to the Law Office's account, yet again.  In light of new depositions to be taken, on September 23-24, Lambert expressed acute concern to Davidoff with regard to his consistent failure to pay.

31.     Among other things, Lambert said that, whatever problems Kalimantano had with its accounts, awaiting wire transfers in vein was no longer satisfactory and demanded that Davidoff sent payments by Western Union.  Davidoff promised that.

32.     On repeated occasions Davidoff assured the Law Office that the cash was prepared for sending by Western Union and the numbers of the transfers were to be e-mailed literally on the next day.  However, that did not happen, too.  Instead, Davidoff did not take the calls from Lambert, explaining later on that he was traveling on business.

33.     In anticipation of the conference in that pending action in the U.S. District Court for the Southern District of New York on November 1, 2013, Lambert urged Davidoff to urgently make the payments, to cover at least the deposition expenditures, due immediately.

34.     Lambert explained that clients' failure to pay to the court reporters, intentionally using their work without paying for it, could be treated as contemptuous to the court proceedings and to the U.S. District Court.  Lambert emphasized that fraud is not tolerated in U.S. courts.

35.     On October 21, 2013, Davidoff e-mailed to the Law Office a copy of the transaction on the account of First Royal, showing that on that day 15,000 Euros was actually deducted, and as though that amount was wired out to the Law Office's instructions.  See Exhibit F.

36.     15,000 Euros stated on October 21, 2013 were subject to the exchange rate of 1.367230, the total being $20,508.45.  See Exhibit F.

37.     Lambert took that copy of the banking transaction e-mailed by Davidoff on its face value, unaware that this was, on information and belief, a forgery, not representing an entry on the banking account of First Royal.

38.     That money, repeatedly promised, was not coming, either, in the days following October 21, 2013.

39.     Lambert traveled to the New York area prior to the conference in that pending action scheduled for November 1, 2013, with a meet-and-confer scheduled with the opposing counsel to take place on the eve.

40.     On October 30, 2013, Davidoff unexpectedly communicated to Lambert by telephone that he had reached a settlement agreement with defendants in that case, who acted through intermediaries in Europe, asking to send a proforma settlement agreement as a basis for his finalizing the settlement arrangements.

41.     Although Lambert advised against attempting to settle without the attorneys of record, Lambert provided per Davidoff's insistence a general draft agreement for a settlement.

42.     On October 31, 2013, Davidoff requested from Lambert to negotiate with defendants' counsel to stipulate on taking off the agenda the conference in the case scheduled for the next day November 1, 2013.  Despite the extremely short time left, Lambert was able to prepare a stipulation, to obtain the consent of defendants' counsel and to file it with the Court.  Relief was granted, the matter provisionally discontinued.

43.     As a part of the telephonic conversations with Davidoff, Lambert learnt that Davidoff was settling with defendants by way of some new contract, closing the matter in the U.S. District Court without a formal settlement.  From Davidoff's oral statements, it became clear that, Davidoff was ignoring his obligations to make the overdue payments.

44.     Davidoff further also stated to Lambert that he did not owe anything either to the Law Office or to the court stenographers, videographers, interpreters, and he did not care about those outstanding overdue invoices.

45.     Davidoff implicitly admitted that all the prior efforts to pay and his purported attempts to wire funds did not actually take place, and the documents showing the wire transfers were untrue.

46.     Lambert realized that the Law Office got scammed.  It appeared that the accumulated invoices from the court stenographers, videographers, interpreters, and the overdue invoices for the legal invoices were intentionally unpaid by Davidoff.  His various promises were a part of a scheme to defraud the Law Office and the persons who provided services in the judicial proceedings.

47.     Accordingly, on the next day, November 1, 2013, Lambert filed the Motion to Withdraw from that matter, Docket 12cv6969 in the U.S. District Court for the Southern District of New York, for the failure by clients to carry out their payment obligations.  The Law Office further asserted the charging lien.  Whereas the Motion was provisionally denied in abeyance of settlement efforts, Davidoff and other plaintiffs could be represented by co-counsel Peter A. Joseph, also counsel of record.

48.     Upon being served by e-mail with the Motion to Withdraw, Davidoff, instead of making urgent corrective steps, engaged in some veiled menaces to his former attorney in the telephonic voice messages and by e-mails.  Suddenly changing his story, Davidoff falsely claimed he did not know where to wire the payments, if needed.

49.     As the result of the above unspeakable scheme to defraud the Law Office, the costs of $16,575.03, accumulated since May 6, 2013, as well as the unpaid invoice of May 6, 2013, for $8,261.28 remain unpaid.

50.     The attorney's work from May 6 to November 1, 2013, amounted to 315.7 hours, with the total of $78,925.00 overdue (at the rate of $250).  The grand total, overdue from Davidoff and/or the entities he controls was $103,761.31.

51.     By way of a context, that is the only time when the Law Office is forced to sue its former clients.  It has embarked on making the claims in the court having no other viable choice, after more than 6 months of getting promises of payments.  However, Davidoff made false promises and commitments, only to obtain further services and to play for time.  Additionally, the Law Office deemed it proper to act without any delay, when its former clients discarded their obligations even to pay for the depositions' transcripts, not tolerating delays.

## COUNT 1.
### (Breach of Contract)

52.     Plaintiff incorporates by reference the allegations in Paragraphs 1-51, as if restated with the same force and effect.

53.     As cited above, Davidoff entered the retainer contract on September 3, 2012, whose terms are incorporated by reference.  See Exhibit A.

54.     Davidoff failed to make payments at any time after March 13, acting intentionally in bad faith.  Davidoff made numerous promises to the Law Office, sending invalid banking documents to it, as though the wire transfers were sent out, which was untrue.

55.     As cited above, Davidoff and the entities he controls, failed to pay the overdue costs of $16,575.03, accumulated since May 6, 2013.  Davidoff also failed to pay the overdue invoice of May 6, 2013, for $8,261.28.

56.     With reference to Exhibit G herewith, the attorney's work from May 6 to November 1, 2013, amounted to 315.7 hours, with the total of $78,925.00 (at the rate of $250), which was also overdue.

57.     The grand total, overdue from Davidoff and/or the entities he controls, which includes Kalimantano, was $103,761.31.

58.     Plaintiff is entitled to the award of the amount $103,761.31, due under the above cited contract.

## COUNT 2.
### (Quantum Meruit, Promissory Estoppel)

59.     Plaintiff incorporates by reference the allegations in Paragraphs 1-51, as if restated with the same force and effect.

60.     The present Count is asserted herewith out of extra precaution, in the alternative.  In the event the Court finds any defects with enforcing the contract of September 3, 2012, Plaintiff seeks to provide relief in equity, quantum meruit or promissory estoppel.

61.     With reference to Exhibit G, all work undertaken in the litigation was reasonable and necessary in litigation.  The attorney's hourly rate of $250 is relatively modest as compared to the average rates for attorneys practicing in the same area in Washington, D.C.

62.     All costs and expenditures are documented, all of those items were necessary and reasonable, and all of those costs were caused per requests of Davidoff.

63.     Therefore, Plaintiff seeks the Court to find that relief on the basis of quantum meruit and/or promissory estoppel would yield the same result as under enforcing the contract.

64.     Plaintiff is entitled, as an alternative to the relief under breach of contract, to the relief in quantum meruit and/or promissory estoppel for the same amount of $103,761.31.

## COUNT 3.
### (Misrepresentation and Fraud)

65.     Plaintiff incorporates by reference the allegations in Paragraphs 1-51, as if restated with the same force and effect.

66.     As cited above, on numerous occasions, Davidoff assured the Law Office that the payments on the overdue invoices were forthcoming.  Davidoff knew that this was false.

67.     By making those misrepresentations, Davidoff attempted to obtain the services without paying for those, thus defrauding the Law Office.

68.     Both Kalimantano and First Royal became the instrumentalities of such misrepresentations and fraud.

69.     When Davidoff received the demand to pay for the depositions' transcripts immediately, he falsely denied that he was aware of the invoices.  However, all the due invoices were sent to Davidoff, with reminders, sometimes more than once, which is established on electronic mail records.

70.     Such deceptive conduct by Davidoff was especially egregious in the light that fraud targeted the mandatory payments arising from the judicial proceedings, in due course.

71.     Plaintiff is entitled to compensatory, punitive or exemplary damages for misrepresentation and fraud.

## COUNT 4.
### (Fraud; False Wire Transfer Banking Document)

72.     Plaintiff incorporates by reference the allegations in Paragraphs 1-51, as if restated with the same force and effect.

14

73.     As mentioned above, on June 21, 2013 Davidoff sent to the Law Office a copy of the bank instruction by Kalimantano to transfer 8,000 Euros.

74.     On June 21, 2013 that amount was subject to the exchange rage 1.311249, for the total $10,489.99.  See Exhibit C.

75.     As Davidoff ultimately admitted, that wire transfer was actually not intended to be effected.  The copy represented an invalid instrument or otherwise was an untrue banking document; in any event it came about to be a scam.

76.     On information and belief, Davidoff caused the banking instruction to be executed, with the sole purpose to be sent as a copy to the Law Office, but not deposited with the bank.  Thus, that purported wire transfer could never be effected.

77.     Davidoff undertook a charade of asking from the Law Office whether that money arrived on the account, expressing even a surprise that it could not be found on the Law Office's account.  That deception lasted weeks and then months.

78.     That scam with the purported banking document operating as a deception, sent by e-mail to the Law Office, falls under the prohibition of various statutes, both federal as well as under the laws of the State of New York and of the District of Columbia.  Among other statutes, the above conduct falls under the prohibitions of 18 U.S.C. §1343 ('Wire fraud').

79.     Plaintiff seeks punitive, exemplary and/or statutory damages to the full extent of any applicable law, for such unspeakable and dishonorable conduct.

80.     Plaintiff seeks to treat the damages for that purported wire transfer as punitive and/or exemplary.  With the compensatory damages counted and cited above, the additional punitive and/or exemplary damages would add a double of the amount of $10,489.99, namely $20,979.98.

**COUNT 5.**
**(Fraud; False Wire Transfer Banking Document; Forgery).**

81.     Plaintiff incorporates by reference the allegations in Paragraphs 1-51, as if restated with the same force and effect.

82.     As mentioned above, after a series of the repeated failures to send payment from Kalimantano's account, on September 16, 2013, Davidoff asked Lambert to send over an invoice for $20,000 to First Royal.  Davidoff promised that now that wire would be immediately processed through the First Royal account.  Lambert complied. See Exhibit D.

83.     On September 19, 2013, Davidoff sent to the Law Office a copy of the banking instructions on behalf of First Royal, for 15,000 Euros, as a proof of the payment actually made.  See Exhibit E.  However, that wire did not come to the Law Office's account.

84.     Without explaining why the wire did not arrive for a month, on October 21, 2013, Davidoff e-mailed to the Law Office a copy of the purported transaction on the account of First Royal.  That e-mail showed that on that day 15,000 Euros was deducted from First Royal's account, as though that amount were indeed wired out to the Law Office's account.  See Exhibit F.

85.     As mentioned above, 15,000 Euros on October 21, 2013 were subject to the exchange rate of 1.367230, the total of $20,508.45.  See Exhibit F.

86.     As Davidoff ultimately admitted on October 31, 2013, that wire transfer was not intended to be effected.  The copy did not represent a valid or true banking document; in any event this was a scam.

87.     On information and belief, Davidoff caused the banking instruction to be executed, but, yet again, not deposited with the bank.

88.     Thus, that wire transfer could never be effected.  Davidoff then undertook a charade of asking from the Law Office to double check whether that money arrived on the account.

89.     Furthermore, on information and belief, the copy of the purportedly executed wire transfer for 15,000 Euros was a forgery, sent on October 21, 2013 to the Law Office in the U.S. by e-mail, with the intent to deceive.

90.     That scam with the purported banking document, sent by e-mail to the Law Office, falls under the prohibition of various statutes, namely federal, as well as under the laws of the State of New York and of the District of Columbia.  Among other statutes, the above conduct falls under the prohibitions of 18 U.S.C. §1343 ('Wire fraud').

91.     Plaintiff seeks punitive, exemplary and/or statutory damages to the full extent of any applicable law, for such unspeakable and dishonorable conduct.

92.     Plaintiff seeks to qualify the damages for that purported wire transfer as punitive, involving, on information and belief, forgery or fabrication of a banking record. With the compensatory damages already cited above, the additional punitive or exemplary damages would add a double of the amount of $20,508.45, namely $41.016.90.

**WHEREFORE**,

Plaintiff Law Office prays for the following relief:

-   Award of the compensatory damages of $103,761.31 on the claim of breach of contract or in quantum meruit or promissory estoppel;

- Award of additional damages for misrepresentations and fraud as the trial determines, under Count 3;

- Award of punitive damages for the false banking document, cited under Count 4, for $20,979.98;

- Award of punitive damages for the false banking document and forgery or fabrication, cited under Count 5, for $41.016.90;

- Thus the total of the damages that should be awarded, should be, at least, $165,758.19;

- Defendants should be held liable for any award severally and jointly;

- Award of attorney's fees and costs, and any other relief that is just and proper.

Respectfully submitted:

Dated: November 4, 2013


/s/_____
GEORGE LAMBERT (D.C. Bar No. 979327),
LAW OFFICES OF LEONARD SUCHANEK
1025 Connecticut Avenue, #1000, NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (800) 852 1950
E-mail: lawdc10@aol.com
Attorneys for Plaintiffs